**In re Alison C. BRIGHT, Debtor.**

**No. 97–18406–WCH.**

United States Bankruptcy Court,
D. Massachusetts.

Aug. 29, 2005.

Deanna M. Silva, McKenzie & Associates, P.C., Boston, MA, for Debtor.

## DECISION ON MOTION FOR RELIEF FROM STAY

WILLIAM C. HILLMAN, Bankruptcy Judge.

In this reopened Chapter 13 case, Washington Mutual Bank, F.A., as successor to

HomeSide Lending, Inc. ("HomeSide"), has moved for relief from stay *nunc pro tunc* or, alternatively, an annulment of the automatic stay.[1] After an evidentiary hearing on the motion, I took the matter under advisement. For the reasons set forth below, I grant the motion and annul the stay retroactively.

### Findings of Fact[2] and Travel of the Case

On July 3, 1986, Alison C. Bright ("Debtor") and Ajibola A. Osinubi ("Osinubi") acquired ownership of real estate located at 35 Abbotsford Street, Roxbury, Massachusetts (the "Property"), as joint tenants. On that date Debtor and Osinubi granted a mortgage on the Property to HomeSide's predecessor in interest. Debtor and Osinubi agreed that for income tax purposes only Osinubi would claim the deduction for interest on the mortgage.[3] The loan application is signed only by Osinubi but does indicate that title will be held jointly with Debtor.[4] The only address given for the borrower is that of Osinubi at 73 Highland Ave., Arlington, Massachusetts. Only Osinubi signed the note. Debtor and Osinubi agreed that Osinubi, who resided in the Property for some period of time, would collect the rents and pay the mortgage, utilities, insurance or taxes.[5]

On September 3, 1997, Debtor filed a voluntary Chapter 13 petition.[6] She testified that she had consulted counsel some months earlier, had told him of her ownership of the Property, signed the schedules in blank, and that her then counsel lied to her about the timing of the filing of the petition.[7] She asserts that she saw the completed schedules for the first time at the § 341(a) meeting.[8]

Her petition and Schedule A indicated that her residence address was 4 Murray Avenue, Roxbury, Massachusetts.[9] Schedule D listed mortgages to HomeSide and Monarch Savings Bank ("Monarch") on "Two Fam/Pri Res" at that address. Her schedules did not disclose an ownership interest in the Property. No account number is given for the HomeSide mortgage listed on Schedule D.

In Schedule F Debtor listed a predecessor of HomeSide and Monarch as unsecured claimants with regard to 6 Murray Avenue, Roxbury, with the notation "Foreclosed Property." This was another property formerly owned by Debtor.

Debtor's plan was confirmed on November 14, 1997. It was a 10% plan although creditors ultimately received 27% because of the total amount of proofs of claim filed.[10]

---

1. Docket No. 20.

2. Strictly speaking, findings of fact and conclusions of law are unnecessary in connection with motions as FED. R. CIV. P. 52(a) only applies in adversary proceedings, FED. R. BANKR. P. 7052, but they add clarity.

3. Draft Joint Pre–Trial Statement ("PTS") ¶ II(27). While titled a "draft" statement, I take that as a typographical error since the PTS was in fact filed with the court. Facts stated in the PTS are "admitted and require no proof." PTS ¶ II.

4. Ex. 1.

5. PTS ¶ II(28).

6. Ex. 2.

7. T. 57–58. Her then counsel was subsequently suspended and then disbarred for reasons not connected with Debtor. *See* Ex. 18.

8. T. 60.

9. PTS ¶ II(14)

10. PTS ¶ II(11). HomeSide did not file a proof of claim.

Notice of Debtor's bankruptcy filing was sent by the court to HomeSide's address given in the schedules, a post office box in Boston.[11] The notice contains Debtor's address of 4 Murray Avenue and her social security number.

HomeSide's witness testified that the box was a "lock box" where the bank processed payments.[12] Correspondence is sent on to HomeSide.[13] Legal correspondence is sent by HomeSide to the Law Offices of Gerald Shapiro, known by the acronym "LOGS" for processing. LOGS has access to HomeSide's "servicing platform," the computer system where loan information is compiled and saved.[14] LOGS would seek to identify the loan involved by the social security number. In this instance it would have found the Murray Avenue information.[15] No other loan would have been found, as HomeSide's records did not contain a social security number for Debtor although her name appears as co-owner.[16] HomeSide's system did not require a Social Security number for a co-owner, as opposed to a co-borrower.[17] However, it would have been possible for HomeSide or LOGS to search the data base by name, or co-owners, or property address.[18] Debtor's involvement with the Property would have been disclosed even if the name search had not included her middle initial, and a search by the address of the Property would also have resulted in finding that information.[19] HomeSide considers the Social Security number search to be the "tried and true" method, as numbers are not duplicated.[20] HomeSide's records do indicate awareness of the Debtor's bankruptcy on February 6, 2002, but only in connection with the Murray Avenue loan.[21]

In June, 2002, the mortgage on the Property went into default and notices were sent to Debtor at P.O. Box 2718 in Boston and at the Property's address.[22] Debtor testified that there was a post office box associated with the Property but she did not have access to it.[23] HomeSide's local counsel searched the PACER data base prior to filing its complaint.[24] The search revealed Debtor's name, and so copies of the schedules were obtained.[25] Because the address of the Property did not appear anywhere in the schedules,[26] HomeSide then filed a complaint to foreclose the mortgage in state court.[27] Osinubi called HomeSide's counsel and requested a reinstatement figure which was sent to him; he did not mention Debtor.[28] Notice was given to Debtor by leaving a copy at the Property and by mail (the record

---

11. Ex. 21. Not to be confused with the post office box to which correspondence regarding the Property was sent.

12. Transcript ("T.") 14.

13. T. 15.

14. T. 12–13.

15. T. 15–16.

16. Ex. 4, 14; T. 22.

17. T. 29.

18. T. 30, 32.

19. T. 34.

20. *Ibid.*

21. Ex. 23, T. 26.

22. PTS ¶ II(12), (13).

23. T. 53–54.

24. T. 40.

25. T. 42.

26. The schedules were introduced as Ex. 2.

27. PTS ¶ II(15).

28. T. 43.

does not indicate to what address the notice was sent) as well as by publication.[29]

A pre-sale title examination undertaken on behalf of HomeSide noted Debtor's bankruptcy and the file information, including the Murray Avenue address,[30] but, as noted, there was nothing in the bankruptcy records to tie the Debtor to the Property. The afternoon before the foreclosure another PACER search was made with the same result.[31] On August 28, 2002 the Property was sold at auction to an unrelated third party who has since resold it.[32]

The auction sale resulted in a surplus. On January 7, 2003 HomeSide filed an interpleader action in state court.[33] Debtor received a copy of the summons and complaint in that action shortly thereafter, and it is stipulated that this was the first time she knew that the property had been or was being foreclosed.[34] She wrote a response to those pleadings in which she asserted her right to half of the surplus as a title-holder and referenced her bankruptcy case.[35] Debtor did not notify the Chapter 13 trustee or the Court of her claim to a share of the surplus proceeds.[36]

On July 10, 2003, the Chapter 13 Trustee filed her final report and account and request for discharge as the plan had been completed.[37] On the same date the Court discharged the Trustee and closed the case.[38]

On February 8, 2005, HomeSide filed a motion to reopen the case [39] and the present motion for retroactive relief from or an annulment of the automatic stay.[40] On March 9, 2005 I granted the motion to reopen.[41]

On March 24, 2005 the Chapter 13 Trustee filed a motion for turnover of $16,952.62 to the estate from the surplus of the foreclosure sale, a sum sufficient to pay a 100% dividend to all of the creditors who had filed proofs of claim in the case.[42] The motion was granted on April 13, 2005.[43] The record does not indicate if that payment has been made.

### The Motion and Opposition

HomeSide argues that, based upon the facts as set forth above, and the principle enunciated by the First Circuit Court of Appeals in *Soares*,[44] it is entitled either to relief from the automatic stay *nunc pro tunc* or to an annulment of the stay:

> HomeSide, without knowledge of the applicability of the automatic stay to its

---

**29.** PTS ¶ II(16)—(19).

**30.** Ex. 15, PTS ¶ II(22).

**31.** T. 44.

**32.** PTS ¶ II(23), (24).

**33.** While this assertion is not contained in Part II of the PTS, it is contained in both parties' narrative statements of the controversy. PTS, pg. 3, 7.

**34.** PTS ¶ II(29). *See also* T. 76. She testified that she received the notice by mail addressed to her at 4 Murray Avenue. T. 54.

**35.** Ex. 5; PTS ¶ II(30),(31).

**36.** PTS ¶ II(31).

**37.** Docket No. 17.

**38.** Docket No. 18.

**39.** Docket No. 19.

**40.** Docket No. 20.

**41.** Docket No. 36.

**42.** Docket No. 44.

**43.** Docket No. 45. A motion for reconsideration was filed (Docket No. 48) and denied (Docket No. 56).

**44.** *Soares v. Brockton Credit Union (In re Soares),* 107 F.3d 969 (1st. Cir.1997).

**24**

Mortgage, sold the Property, more than two years ago to a third party ... [who] has since conveyed the Property to yet another party. Bad faith on the part of Bright, ignorance of the filing of a bankruptcy petition affecting the Property by HomeSide, and general equitable considerations for subsequent good faith purchasers requirement annulment of the automatic stay.... [45]

Debtor's Opposition argues that the motion be denied since (1) HomeSide had constructive if not actual knowledge of the bankruptcy case; (2) HomeSide has failed to show that the Debtor intended to commit fraud by the omission of the Property and the mortgage thereon from her schedules; and (3) HomeSide has failed to satisfy the *Soares* standard for retroactive relief or annulment of the stay.[46] In her conclusion, Debtor asks that, in addition to the denial of the motion, she receive "such other and further relief as the Court deems necessary, including but not limited to, actual and punitive damages, costs and attorneys' fees caused by HomeSide's violation of the automatic stay and the wrongful foreclosure." [47]

### Discussion and Conclusions of Law: Damages

Debtor's demand for damages and related relief would appear to arise under 11 U.S.C. § 362(h):

An individual injured by any willful violation of a stay provided by this section shall recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages.

At the opening of the hearing I had this discussion with one of Debtor's counsel:

THE COURT: ...Mr. McKenzie, what do you want in this case?

MR. McKENZIE: Principally, Your Honor, we—we would like to see ... the debtor compensated for the losses sustained as a result of the breach. We'd also like to see some relief on the—the injury to the—to the credit of the debtors.

THE COURT: Okay. And the losses are the loss of the use of the money that you're alleging as a result of them bringing an interpleader, and so you didn't get the money for a year?

MR. McKENZIE: Loss of—no, beyond that, loss of the equity in the property, as well as the use of money, and the other hardships that we expect (unclear) Your Honor.

THE COURT: I've got more problem with that. Okay. I'll wait for the trial and hear what the evidence is.[48]

■ In order to recover damages, Debtor must first show that there was a stay violation (conceded here); that the violation was willful; that she has incurred actual damages, including costs of attorney's fees; and, if appropriate, that the circumstances are such that punitive damages shall be awarded.

■ While one could argue the willfulness of HomeSide's stay violation,[49] Debtor's problem is more acute: She introduced not a scintilla of evidence as to any damages which she had suffered.

---

45. Docket No. 20, ¶ 30.

46. Docket No. 25.

47. *Id.,* p. 16.

48. T. 3.

49. "A willful violation does not require a specific intent to violate the automatic stay. The standard ... under § 362(h) is met if there is knowledge of the stay and the defendant intended the actions which constituted the violation." *Fleet Mortgage Group, Inc. v. Kaneb,* 196 F.3d 265, 269 (1st Cir.1999).

There was no evidence introduced about the state court interpleader action, the value of the Property at the time of sale, the amount of losses sustained by lost opportunity costs, or any other expenses or elements of damages which Debtor has purportedly suffered. Affirmative relief cannot be granted to Debtor on this record.

### Discussion and Conclusions of Law: Relief Sought

■ In *Soares* the Court of Appeals held directly that actions in violation of the automatic stay are void but "recognize[d] that equitable considerations may alter some outcomes" and that " § 362(d) permits bankruptcy courts to lift the automatic stay retroactively and thereby validate actions which otherwise would be void." [50]

■ It then went on to determine "the yardstick by which attempts to secure such relief should be measured." [51] It continued:

> We conclude, therefore, that although courts possess a limited discretion to grant retroactive relief from the automatic stay, instances in which the exercise of that discretion is justified are likely to be few and far between.
>
> We do not suggest that we can write a standard that lends itself to mechanical application. Each case is sui generis and must be judged accordingly. . . .some examples may be helpful.
>
> When a creditor inadvertently violates the automatic stay in ignorance of a pending bankruptcy, courts sometimes have afforded retroactive relief. By like token, debtors who act in bad faith may create situations that are ripe for retroactive relief.

These examples—a creditor's lack of notice or a debtor's bad faith—clearly do not exhaust the possibilities. But they illustrate that a rarely dispensed remedy like retroactive relief from the automatic stay must rest on a set of facts that is both unusual and unusually compelling. [52]

■ HomeSide contends that it had no reason to know that the Property was implicated in Debtor's bankruptcy because her Social Security number did not appear in connection with that real estate. I find this somewhat unconvincing. The fact that it does not include the Social Security numbers of co-owners in its data base makes its ignorance a self-inflicted wound. Further, its testimony that a Social Security number is unique and hence the only necessary search also rings hollow. The Property's address is also near to unique and would be a useful search criterion in (for example) cases where the current owner is not the mortgagor or where there is an error in the Social Security number given. The testimony is that HomeSide's data base can be searched in a variety of ways other than by Social Security number but it was not. The equities do not favor HomeSide based on its lack of knowledge.

On the other hand, if Debtor's schedules had included the Property all of this difficulty would have been avoided. The PACER search would have found her name; the review of her schedules would have turned up the Property

Debtor places the blame for the omission on her former counsel, no longer a member of the bar. She testified that she signed the schedules in blank, although under the penalties of perjury. Even if it is true that Debtor told her counsel of her ownership interest in the Property and he

---

**50.** 107 F.3d at 976.

**51.** 107 F.3d at 977.

**52.** *Ibid.* (citations omitted).

failed to include it in the schedules, she must bear the burden of that error and her choice of an attorney; she cannot now avoid the consequences of that selection.[53] The equities do not favor her.

In *Soares*, the foreclosure in violation of the stay resulted in the mortgagee purchasing at the sale.[54] There is no indication in the opinion that the mortgagee had parted with ownership; indeed, it appears that the debtor promptly brought the stay violation to the attention of the state court.[55] The situation here is different— HomeSide sold the Property to a third party who has conveyed it to a fourth party, neither of them being brought into the present litigation and perhaps completely unaware of it. Equity should protect such remote innocent parties, and it is on their behalf that I shall grant the relief sought. There is an incidental benefit to HomeSide in this result of which it is undeserving but it cannot be avoided. There is no detriment to Debtor as she has not established that she was in any way damaged by the sale.

## Conclusion

An order will enter granted an annulment of the automatic stay effective to validate the sale of the Property.

**53.** *In re A. Cardi Const. Co.*, 154 B.R. 403, 407 (Bankr.D.R.I.1993), quoting *United States v. Parcel of Land, etc.*, 928 F.2d 1, 6 (1st Cir. 1991).

**54.** 107 F.3d at 972.

**55.** *Ibid.*